**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 4:25-CR-594 |
| | : | |
| Plaintiff, | : | |
| | : | JUDGE DONALD C. NUGENT |
| vs. | : | |
| | : | |
| JERIAH MAST, | : | **MOTION TO DISMISS INDICTMENT** |
| | : | |
| Defendant. | : | |

Jeriah Mast moves this Honorable Court to dismiss the indictment against him alleging violations of 18 U.S.C. § 2423(c) and (e). (eff. 2004 & 2006). Title 18 U.S.C. § 2423 as applied to Jeriah exceeds Congress's authority under the United States Constitution. Jeriah acknowledges that a published Sixth Circuit case precludes this Court from ruling in his favor. However, he files this motion to preserve the issue for further review by the Sixth Circuit and the United States Supreme Court.

**I.     Introduction**

Jeriah Mast was raised in Millersburg, Ohio as part of the Mennonite community. From a young age, the Mennonite Church played an important role in his family's life. Through his church, Jeriah became involved with Christian Aid Ministries, which is headquartered in Millersburg.[1] Christian Aid Ministries focuses on "connect[ing] people who want to help with people who need help."[2] To achieve its goal, Christian Aid Ministries sends volunteers to various countries to help

---

[1] *See Christian Aid Ministries*, https://christianaidministries.org/ (last accessed April 20, 2026).
[2] *Christian Aid Ministries, About Us*, https://christianaidministries.org/about/#our-purpose (last accessed April 20, 2026).

1

provide basic needs, fight poverty, and help restore homes and infrastructure. The volunteers also spread the word of God to communities all over the world.

Jeriah made his first trip to Haiti as a missionary in 2002. Over the following 17 years, Jeriah spent most of his time in Haiti working through Christian Aid Ministries and periodically returning home to visit family. In 2019, when he returned to Ohio, Jeriah confessed to his pastor about inappropriate contact with four minors in Ohio. On May 22, 2019, Jeriah voluntary initiated an interview with law enforcement in Holmes County, Ohio. He admitted his unlawful contact with the four local minors as well as sexual contact with a number of minors while living in Haiti.

In October 2019, Jeriah pled guilty to two counts of gross sexual imposition in Holmes County Court of Common Pleas Case No. 19CR069 and was sentenced to nine years in state prison. On February 2, 2024, an Assistant United States Attorney for the Northern District of Ohio declined to accept Jeriah's case for prosecution. The AUSA reasoned that "in light of [the] 6th Circuit decision in US v. Al Maliki[, 787 F. 3d 784 (6th Cir. 2015),] and the lack of evidence of a commercial sex act, combined with the fact that [Jeriah] is serving a significant state sentence, [the U.S. Attorney's Office is] declining the case." Jeriah was released from state custody on October 27, 2025, and began his period of post release control which included prohibitions on Jeriah leaving his residence overnight or leaving the State of Ohio without permission.

On November 4, 2025, the Department of Homeland Security obtained an arrest warrant for Jeriah based on probable cause to believe he violated 18 U.S.C. § 2423(c) by engaging in illicit sexual contact with minors while living in Haiti. Jeriah was arrested the following day and has remained in federal custody. On December 2, 2025, an indictment was filed charging Jeriah with four counts of engaging in illicit sexual conduct in a foreign place or attempting to do so. The charges allege conduct that occurred while he was living in Haiti in 2004, 2007, and 2011, and

therefore cite to previous versions of the statute. (R. 1: Indictment, citing § 2423 eff. April 30, 2003 & July 27, 2006).

Section 2423(c), during the relevant time periods, prohibits "[a]ny United States citizen or alien admitted for permanent residence [from] travel[ing] in foreign commerce, and engag[ing] in any illicit sexual conduct with another person." 18 U.S.C. § 2423(c) (eff. April 30, 2003 & July 27, 2006). "Illicit sexual conduct" is defined as (1) a non-commercial sex act, (2) a commercial sex act, or (3) the production of child pornography. 18 U.S.C. § 2423(g). A commercial sex act is "any sex act, [with a person under 18 years of age], on account of which anything of value is given to or received by any person." 18 U.S.C. § 2423(g)(2); 18 U.S.C. § 1591(e)(3). By contrast, a non-commercial sex act is defined under 18 U.S.C. § 2246 and includes, as relevant here, "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(2)(D). The government has not alleged in the indictment that Jeriah committed any commercial sex act and had previously declined to prosecute Jeriah because there was no evidence of a commercial sex act. Based on this, Jeriah focuses his argument on the unconstitutionality of the non-commercial sex act portion of 18 U.S.C. § 2423(c).

Although the Sixth Circuit's decision in *United States v. Rife*, 33 F.4th 838 (6th Cir. 2022), forecloses Jeriah's argument in this Court, he files this motion to preserve this issue for further review. Jeriah maintains that the statute is unconstitutional as applied to him because it exceeds the scope of congressional authority under the Foreign Commerce Clause and the Necessary and Proper Clause. The non-commercial application cannot draw authority from the Foreign Commerce Clause because there is no connection to foreign commerce, and it cannot draw

3

authority from the Necessary and Proper Clause because the non-commercial application of the statute is not necessary to give effect to the relevant treaty.

**II.      Congress has limited authority to regulate conduct in a foreign jurisdiction.**

Congress may only enact laws that it has the authority to enact under the Constitution. *United States v. Comstock*, 560 U.S. 126, 133 (2010). Thus, just like any law, Congress may only regulate extraterritorial conduct to the extent it has authority to do so under the Constitution. *See United States v. Firestone Tire & Rubber Co.*, 518 F. Supp. 1021, 1032 (N.D. Ohio 1981)("The power of Congress to prescribe rules governing the extraterritorial conduct of its nationals is circumscribed only by the safeguards of the United States Constitution").

There are two ways that Congress can regulate extraterritorial conduct using its enumerated powers under the Constitution. One avenue is through the Foreign Commerce Clause. *See* U.S. CONST. Art. I, § 8, cl. 3. The other avenue is through the Necessary and Proper clause to implement treaties. *See Rife*, 33 F.4th at 846 (quoting *Bond v. United States*, 572 U.S. 844, 874-875 (2014)) (Scalia, J.. concurring in the judgment) (read together Art. I, § 8, cl. 18, and Art. II, § 2, cl. 2, "empower Congress to pass laws 'necessary and proper for carrying into Execution . . . [the] Power . . . to make Treaties."). Under both clauses, 18 U.S.C. § 2423(c) fails to pass constitutional muster.

**A.  Congress lacks authority under the Foreign Commerce Clause to apply § 2423(c) to a non-commercial sex act.**

The Sixth Circuit has correctly held that a non-commercial sex act under § 2423(c) does not fall within Congress's power to regulate foreign commerce and therefore cannot be upheld as constitutional under the Foreign Commerce Clause. *Rife*, 33 F.4th at 842. The Foreign Commerce Clause gives Congress the power to "regulate Commerce with foreign nations[.]" U.S. CONST. Art. I, § 8, cl. 3. Commerce meant, at the time of founding, trade, economic intercourse and traffic, and

the exchange of one thing for another. *Id.* at 842. That original meaning has never been expanded. *Id*. at 842-44. The Sixth Circuit reasoned that although § 2423(c) requires travel in interstate commerce, that movement, standing alone, is not a criminal offense. *Id*. at 845. For this reason, a conviction under § 2423(c) "for molesting his two victims in [a foreign country], years after he travelled there, and without any commercial exchange, [is] not an exercise of Congress's power to regulate Commerce with foreign Nations." *Id*. at 845 (internal citations omitted).

Based on the Sixth Circuit's decision in *Rife*, the charges against Jeriah are beyond Congress's constitutional authority under the Foreign Commerce Clause.

### B. The President may make treaties with the advice and consent of Congress, and Congress may under the Necessary and Proper Clause enact legislation to give effect to a ratified treaty.

The President has the power to make treaties with foreign nations, which must then be approved by two-thirds of the Senate. U.S. CONST. Art. 2 § 2. When the President sends a treaty to the Senate for advice and consent, the President transmits a letter detailing his rationale for entering into the treaty. The Senate Committee on Foreign Relations publishes reports and documents related to its consideration of the treaty. These documents—the President's letter and the Congressional reports—provide insight into the purpose of the treaty. If the Senate approves the treaty, the President officially ratifies the treaty by signing it and exchanging formal documents with the other nations.

Once a treaty is ratified, Congress may, under the Necessary and Proper Clause, enact legislation to give effect to the treaty. *See Neely v. Henkel*, 180 U.S. 109, 121 (1901); *see also McCulloch v. Maryland*, 17 U.S. 316, 421 (1819). "In determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation

of a constitutionally enumerated power." *United States v. Comstock*, 560 U.S. 126, 134 (2010). In the context of treaties, to qualify as an "implementing statute," the statute must "track [] the language of the treaty in all material respects." *United States v. Belfast*, 611 F.3d 783, 806 (11th Cir. 2010) (citing *United States v. Wang Kun Lue*, 134 F.3d 79, 84 (3rd Cir. 1997), *United States v. Ferreira*, 275 F.3d 1020, 1027-28 (11th Cir. 2001)). *Belfast* explains that if a statute effects, realizes, or furthers the treaty's "meaning" or "scope," the statute constitutes "a means that is rationally related" to the treaty's implementation. *Id.* at 806.

### 1. The Sixth Circuit incorrectly held § 2423(c) was constitutionally valid under the Necessary and Proper Clause.

In *Rife*, the Sixth Circuit upheld the non-commercial application of § 2423(c) as constitutional. *Rife*, 33 F.4th at 848. It found that the statute derived its authority from the Necessary and Proper Clause, because it was "not so unrelated" to the provisions of a U.N. treaty, the Optional Protocol to the Convention on the Rights of the Child on the sale of children, child prostitution and child pornography (hereinafter "*Optional Protocol*"). *Id.* The Sixth Circuit noted that the treaty power under the Necessary and Proper Clause is concerningly broad as it relates to regulating conduct it would not otherwise have power to regulate, as this clause places Congress "one treaty away from acquiring a general police power." *Id.* at 846. However, the Sixth Circuit decided it was bound by the holding in *Missouri v. Holland* that a valid treaty must have a valid statute of implementation. *Id.* at 848 (citing *Missouri v. Holland*, 252 U.S. 416 (1920)).

The Sixth Circuit's decision in *Rife* is wrong. The Court failed to review the details of the relevant treaty and erred in finding the statute was rationally related. A closer examination of the treaty reveals that a non-commercial application of the statute has no rational relationship to the treaty and thus does not fall within the scope of *Holland*'s holding.

2. **The *Optional Protocol* to the Convention on the Rights of the Child has a clear and unambiguous purpose to protect against the sale of children, child prostitution and child pornography, which is broader than the scope of § 2423(c) as applied to Jeriah.**

On November 20, 1989, the United Nations adopted the Convention on the Rights of the Child, which offered broad protections for children.[3] The United States did not ratify this treaty. On May 25, 2000, the United Nations adopted the Optional Protocol to the Convention on the Rights of the Child on the sale of children, child prostitution, and child pornography, ("*Optional Protocol*").[4] This *Optional Protocol* was enacted explicitly to "guarantee the protection of the child from the sale of children, child prostitution and child pornography." *Optional Protocol*, p. 247. The United States ratified this *Optional Protocol* on June 18, 2002. The *Optional Protocol* is "narrower and more specific" in scope than the general protections of the child under the Convention on the Rights of the Child, in that it focuses solely on prohibiting the sale of children, child prostitution and child pornography. *Optional Protocol*, p. 248; *United States v. Ortiz*, __ F.Supp.3d ___, 2025 WL 4218415, at *13 (M.D. Fla. Dec. 5, 2025)

The *Optional Protocol* defines the terms of sale of children, child prostitution, and child pornography as:

(a) Sale of children means any act or transaction whereby a child is transferred by any person or group of persons to another for remuneration or any other consideration;

---

[3] *Convention on the Rights of the Child on the Sale of Children*, United Nations, New York, (1577 U.N.T.S. 44) available here https://www.ohchr.org/en/instruments-mechanisms/instruments/convention-rights-child (last accessed April 17, 2026).

[4] *Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography*, United Nations, New York (2171 U.N.T.S. 247-254) available at https://www.ohchr.org/en/instruments-mechanisms/instruments/optional-protocol-convention-rights-child-sale-children-child (last accessed April 17, 2026).

(b) Child prostitution means the use of a child in sexual activities for remuneration or any other form of consideration;

(c) Child pornography means any representation, by whatever means, of a child engaged in real or simulated explicit sexual activities or any representation of the sexual parts of a child for primarily sexual purposes.

*Optional Protocol*, p. 248, Art. II.

The *Optional Protocol* requires participating nations to "prohibit the sale of children, child prostitution, and child pornography." *Optional Protocol*, p. 248, Art. I. Specifically, the *Optional Protocol* requires nations to punish the sale of children, including:

- The offering, delivering or accepting, by whatever means, a child for the purpose of: (a) Sexual exploitation of the child; (b) Transfer of organs of the child for profit; or (c) Engagement of the child in forced labour;

- Improperly inducing consent, as an intermediary, for the adoption of a child in violation of applicable international legal instruments on adoption;

*Optional Protocol*, p. 249, Art. III. The *Optional Protocol* further requires nations to punish the offering, obtaining, procuring or providing a child for child prostitution, and the producing, distributing, disseminating, importing, exporting, offering, selling or possessing child pornography for stated purposes. *Optional Protocol*, p. 249, Art. 3. The *Optional Protocol* does not cover the broader conduct of illicit sexual conduct as defined in 18 U.S.C. § 2423(c). *See Ortiz*, __ F.Supp.3d ___, 2025 WL 4218415, at *11-13. "A fair reading of the *Optional Protocol* confirms that the intended and exclusive target is the domestic or transnational exploitation of children by means of sale, prostitution, and pornography (each requiring either a remuneration or making an image) and sex tourism, a frequent transnational means of effecting the three named offenses." *Id*. at *9.

When interpreting a treaty, courts must first look to its plain language. *Martinez v. United States*, 828 F.3d 451, 475 (6th Cir. 2016). The treaty's text must be interpreted in accordance with

the ordinary meaning to be given to the terms of the treaty in their context and in light of the treaty's object and purpose. *Id.* Only if the language is ambiguous when read in the context of the treaty's structure and purpose, may the courts use extraneous information like the history of the treaty, the content of the negotiations concerning the treating, and the practical construction adopted by the contracting parties. *Id.* Significantly, courts may not read into a treaty a meaning which its words do not import. *Id.*

Here, the *Optional Protocol* is clear in its language and unambiguous about its purpose. The *Optional Protocol* prohibits the sale of children, child prostitution, and child pornography. *Optional Protocol*, p. 248, Art. I. "Nothing in the treaty or in the ratification history even distantly suggests that the *Optional Protocol* endeavors to eliminate or address anything other than [these] three categories of crime delineated and repeatedly emphasized in the *Optional Protocol*." *Ortiz*, ___F.Supp.3d ___, 2025 WL 4218415, at *13. Nowhere does the *Optional Protocol* prohibit the "illicit sexual conduct" as criminalized by 18 U.S.C. § 2423(c).

The specificity of the *Optional Protocol*'s language is important, because it only focuses on commercial sexual conduct by prohibiting transactions, exchange, and the production of imagery involving child sex abuse. The *Optional Protocol* has a goal to "eliminate the worldwide market in child trafficking and sex tourism." *United States v. Reed*, 2017 U.S. Dist. LEXIS 118020, 2017 WL 3208458, at *57 (D.D.C. 2017). This is a different goal than eliminating the sexual touching of children. Prosecuting an American residing abroad who sexually touches a child "for no commercial purpose" brings the States Parties to the *Optional Protocol* no closer to that goal and encroaches on "the domestic matters of another country." *Id.* at 57-58. Because the *Optional Protocol* is clear in its specific language to prohibit the sale of children, child prostitution, and child pornography, an additional meaning to prohibit the general conduct of sexually touching

minors cannot be read into the treaty. Since the treaty differs in its plain meaning and goals than the statute, the *Optional Protocol* does not "track[] the language of the treaty nor rationally and reasonably relate to the elimination of the sale of children, the elimination of prostitution of children, or the elimination of child pornography, or even the elimination of 'sex tourism'." *Ortiz*, ___F.Supp.3d ___, 2025 WL 4218415, at * 14. The scope of the statute, when applied in a non-commercial context, is plainly broader than the specific scope of the treaty. Therefore, the statute as applied to Mr. Mast cannot derive its authority from the Necessary and Proper clause, because that application of the statute is not rationally related to the treaty.

> **3. A review of the *Optional Protocol*'s ratification history indicates that the United States did not want to assume the broader obligations of the Convention on the Rights of the Child.**

At the time of the passage of the *Optional Protocol* in 2000, there was an understanding that the United States would not assume any broader obligations under the Convention on the Rights of the Child which the United States never ratified. "[B]oth the President and the Senate in the *Optional Protocol*'s ratifying documents explicitly disavow any obligation under the Convention." *See Ortiz*, ___F.Supp.3d ___, 2025 WL 4218415 at *13.

When transmitting the *Optional Protocol* to the Senate for advice and consent, the President included a letter of transmittal explaining the *Optional Protocol* and the reasons for ratifying it. S. Treaty Doc. No. 106-37, 2000 WL 33366017 (July 5, 2000).[5] The President's letter emphasizes that "by ratifying the Protocol, the United States understands that it would not become a party to the Convention or assume any rights or obligations under the Convention." *Id.* at 4. The President recommended "the following understanding" to "accompany the U.S. instrument of

---

[5] Available at: https://www.congress.gov/treaty-document/106th-congress/37/B/document-text (last accessed April 20, 2026).

ratification: The United States understands that the Protocol constitutes an independent multi-lateral treaty, and that the United States does not assume any obligations under the Convention on the Rights of the Child by becoming a party to the Protocol." *Id.*

The President's letter includes a report by the State Department, which included "article-by-article analysis" of the *Optional Protocol* and a number of recommended "understandings and declarations." *Id.* at 1, 13-34. Regarding Article 13, the Signature and Ratification section, the State Department explains and emphasizes that the Optional Protocol does not bind the United States to the Convention on the Rights of the Child. *Id.* at 33. The State Department recommends the same understanding that the President recommended in his transmittal letter. *Id.*

After the Senate received the President's letter of transmittal and the treaty, the Senate Committee on Foreign Relations reviewed the *Optional Protocol* and drafted Executive Report 1074.[6] In the Report, the Committee made the same recommendation as the President to include in ratification, "the first proposed understanding" that "the United States does not assume any obligations under the Convention on the Rights of the Child by becoming a party to the Protocol." *Id.* at p. 8. When the Senate consented to the *Optional Protocol* on June 18, 2002,[7] the very first understanding listed in the resolution was a confirmation that the "United States assumes no obligations under the Convention on the Rights of the Child by becoming a party to the Protocol." *Id.*

Thus, the history of the *Optional Protocol*'s enactment shows that United States did not intend to adopt broader protections for minors under the Convention on the Rights of the Child,

---

[6] Available at: https://www.congress.gov/committee-report/107th-congress/executive-report/4/1 (last accessed April 20, 2026).
[7] *Resolution of Ratification: Senate Consideration of Treaty Document 106-37(B)*, available at https://www.congress.gov/treaty-document/106th-congress/37/B/resolution-text (last accessed April 20, 2026).

and the United States adopted the Optional Protocol on its narrow basis. The treaty was not ratified to criminalize any more conduct than the scope of the treaty. Thus, a non-commercial application of §2423(c) does not comport with the legislative intent of ratifying the treaty and is not rationally related to the treaty.

### 4.  The holding in *Missouri v. Holland* is inapplicable to this statute.

Finally, *Missouri v. Holland,* 252 U.S. 416, provides no support to say that a non-commercial application of the statute is constitutional. The Sixth Circuit erroneously relied on *Holland* when deciding the non-commercial application's constitutionality in *Rife*.

In *Holland*, the United States enacted the Migratory Birds Act of 1918 to enact a treaty to protect migratory birds. 252 U.S. at 431. The State of Missouri sued on sovereignty grounds. *Id.* The Court held that treaties carry the same power as federal laws and thus could supersede state authority. *Id.* at 432. The Court stated, "If the treaty is valid there can be no dispute about the validity of the statute under Article I, § 8, as a necessary and proper means to execute the powers of the Government." *Id.* The Court upheld the 1918 Act because the statute implemented the same language as the treaty. *Id.* at 432, 435. There was no dispute that the scope of the statute did not exceed the scope of the treaty or was otherwise unrelated.

A non-commercial application of 18 U.S.C. § 2423(c) to Jeriah's case is distinguishable from *Holland* because the statute's application exceeds the scope of the treaty. As explained above, the non-commercial application of the statutory subsection does not relate to a treaty and was not enacted to carry out a treaty. The statute is therefore outside the scope of the treaty. The Sixth Circuit's opinion is devoid of analysis regarding why the statute is rationally related to the *Optional Protocol*. Because the statute is not related to the treaty, the Sixth Circuit's reliance on *Holland* is misplaced.

III.    **Conclusion**

Title 18 U.S.C. § 2423(c) is unconstitutional as applied to Jeriah. A non-commercial application of § 2423(c) "unhinges the balance of powers carefully crafted by the Framers." *Reed*, 2017 U.S. Dist. LEXIS 118020 at \*63. Congress has no authority under the Foreign Commerce Clause because the application does not regulate foreign commerce. Additionally, Congress does not have authority under the Necessary and Proper Clause because the statute does not rationally relate to a treaty and does not fall under the holding of *Holland*. Because Congress was without constitutional authority in extending the statute to a non-commercial application, it is unconstitutional and the Sixth Circuit erred in holding otherwise.

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

*/s/Edward G. Bryan*
EDWARD G. BRYAN
Assistant Federal Public Defender
Ohio Bar: 0055556
1660 West Second Street, Suite #750
Cleveland, OH 44113
(216) 522-4856 Fax: (216)522-4321
E-mail: edward_bryan@fd.org

13